Robert BURKE, Plaintiff,

v.

ITT AUTOMOTIVE, INC., Defendant.

No. CIV–87–1182C.

United States District Court, W.D. New York.

Oct. 15, 1991.

Quinn & McGarry, P.C. (Frank P. McGarry, of counsel), Buffalo, N.Y., for plaintiff Robert Burke.

Phillips, Lytle, Hitchcock, Blaine & Huber (Michael R. Moravec, of counsel), Buffalo, N.Y., for defendant ITT Automotive, Inc.

CURTIN, District Judge.

## INTRODUCTION

Plaintiff Robert Burke commenced this action on September 9, 1987, alleging that defendant ITT Automotive, Inc. ("ITT"), had discharged him on the basis of his age and had denied him employee benefits in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*, and the New York State common law of contract.

Following a long-running discovery dispute that centered on the plaintiff's allegations that ITT had refused to produce certain documents, the court found that sanctions should be imposed against ITT at least in the form of attorney's fees and related expenses. *See* Item 46 at 15–16; Item 28 at 1; Item 36 at 1; Item 43 at 1. Currently pending before the court is the plaintiff's motion to strike ITT's answer in light of ITT's continued failure to produce the documents at issue despite orders directing it to do so by both the court and United States Magistrate Judge Edmund F. Maxwell.

## FACTS

a) *Background of the Plaintiff's Claims*

The plaintiff began working for ITT in 1969. He started his employment as Manager of Cost Accounting and subsequently received several promotions: in 1970, he was promoted to Comptroller of the Accounting Department; in 1971, he was promoted to Division Comptroller; and in 1976, he was promoted to Comptroller of the Aimco Division, a separate and larger division of ITT. On March 5, 1987, the plaintiff was dismissed by ITT, and he was told that his termination was based on his job performance. Specifically, the plaintiff was alleged to have either used or been responsible for the use of improper accounting procedures. The plaintiff was also informed that, in accordance with ITT policy, he would receive severance pay and other employee benefits. On May 7, 1987, the plaintiff was notified that, based on the discovery of his involvement in an alleged conflict of interest, the basis for his discharge was being changed to termination for cause. He was then informed that, also in accordance with company policy, his discharge for cause meant that he would not be entitled to severance pay or other employee benefits. At the time of his dismissal, the plaintiff was fifty-two years old, and he was replaced by an individual who, according to the plaintiff, was forty-five years old[1] and had less experience than the

---

1. ITT has stated that the individual who replaced the plaintiff was forty-seven years old at

the time. *See* Item 14, Affidavit of Richard Lorraine at ¶ 14.

plaintiff. According to the plaintiff, employees of ITT normally retire at the age of seventy. The plaintiff maintains that he had always received satisfactory or superior job-performance ratings while employed by ITT, and that, in fact, he was illegally discharged on the basis of his age.

ITT maintains that it had legitimate reasons for dismissing the plaintiff that had nothing to do with his age. According to ITT, the plaintiff was initially dismissed in March, 1987, because of two separate incidents involving the use of improper accounting procedures. The first allegedly occurred in late 1984, when Aimco sold over one million dollars' worth of steel inventory back to its supplier, only to repurchase the same steel a few months later. According to ITT, this transaction was designed simply to reduce the amount of inventory appearing on Aimco's books at the end of 1984, and the plaintiff was criticized for his role in the transaction by Richard Lorraine, an ITT Vice President who was ITT's Chief Financial Officer from December, 1984, to April, 1990. The second incident allegedly occurred in late 1986 when, according to ITT, an entry was made in Aimco's books reflecting a capital accrual for equipment that Aimco had not yet received. ITT asserts that the entry represented a material misstatement of capital spending. ITT claims that these two incidents formed the basis for the plaintiff originally being terminated.

ITT asserts that the reason for changing the basis of the plaintiff's dismissal in May, 1987, was also unrelated to his age. ITT claims that it learned in April, 1987, that the plaintiff and another ITT employee were involved with a company called North American Brake Industries, Inc. ("NABI"). According to ITT, the plaintiff has admitted that he paid NABI's incorporation fee as well as attorney's fees related to the company's incorporation. ITT asserts that NABI had solicited business from ITT customers and that it had done so at meetings in which the plaintiff and the other ITT employee had participated. ITT contends that it considered the actions of the plaintiff and the other employee to constitute a conflict of interest that justified termination without severance pay or other benefits.

The parties are in dispute as to whether the documents at issue relate to all the reasons asserted by ITT for the plaintiff's discharge. The plaintiff maintains that all the alleged grounds for the discharge are interrelated, and that the requested documents will thus shed light on all issues pertaining to ITT's defenses. For its part, ITT contends that the documents sought by the plaintiff at best pertain only to its claims relating to the use of improper accounting procedures, and that they are irrelevant to its claim that the plaintiff was guilty of a conflict of interest. Although the grounds asserted by ITT for originally dismissing the plaintiff appear to be distinct from the grounds asserted for later changing the basis of the plaintiff's dismissal, it is impossible to determine the precise relevance of the disputed documents because they have never been produced.

### b) *The Discovery Dispute*

The court has been endeavoring to determine an appropriate sanction, considering whether it would be fair and reasonable to strike ITT's answer in its entirety, to strike the answer only insofar as it relates to those defenses dealing with the original termination, or to order some alternative sanction. In order to put the court's decision in context, the history of the discovery dispute shall be set forth in detail.

Difficulties arose soon after this lawsuit was filed. On or about November 11, 1987, the plaintiff forwarded notices for depositions and for the discovery of documents; the document requests were designated returnable on December 9, 1987. By the time the parties met with the court on December 15, 1987, ITT had not responded to either of the plaintiff's notices. On December 16, ITT filed its response to the plaintiff's document requests, and also informed the plaintiff by letter that it would not produce the individuals designated by the plaintiff for depositions, expressing its intention to select a person to be deposed as its representative. *See* Items 4–6; Item 9 at Attachment A. The plaintiff was then

forced to move to compel ITT to supply numerous documents, bringing an order to show cause on January 12, 1988. *See* Item 7. The court notes that even a cursory review of the discovery demand made clear that many of the documents should have been provided readily by ITT. In addition, although defense counsel indicated in his December 16 letter that he would reschedule depositions for early January, 1988, he had not done so by the time the court met with counsel on January 22. After considering affidavits and oral arguments of counsel for both parties, *see* Items 8 and 9, the court, in an order dated February 2, 1988, referred the supervision of discovery to Magistrate Maxwell. *See* Item 10.

On July 12, 1988, the Magistrate issued an order directing ITT to turn over certain documents within 60 days. *See* Item 11. He continued to meet with the parties through the summer and fall of 1988 and, in an order dated November 14, 1988, directed that discovery be completed by April 10, 1989. *See* Item 12.

When the parties met with the court in July, 1989, it appeared that discovery, while still ongoing, would be completed shortly. ITT wished to file a motion for partial summary judgment, and the court, in an order dated July 31, 1989, directed that the motion be filed by October 5, 1989. *See* Item 13. Satisfied that a short extension would be sufficient for the completion of discovery, the court directed that discovery be completed by that date as well. ITT eventually filed a motion for summary judgment along with a supporting memorandum of law and statement of material facts on October 10, 1989. *See* Items 14–16.

The plaintiff filed a motion to compel discovery on November 1, 1989, detailing ITT's failure to provide discovery as directed by the Magistrate. *See* Item 17. In his supporting affidavit, plaintiff's counsel explained that Lorraine—the person who made the decision to dismiss the plaintiff— had stated that the reason the plaintiff had

been dismissed was that ITT's corporate auditor, Arthur Andersen & Company, had criticized the plaintiff's accrual of capital for equipment that was ordered in 1986 but that was not to be received until 1987. Plaintiff's counsel also indicated in his affidavit that the plaintiff had stated under oath that he had played no part in the disputed capital accrual and that, in fact, he had never been criticized for his accounting practices before his dismissal, all of which he maintained would be borne out by the Arthur Andersen report itself. The Arthur Andersen report and related documents were, therefore, essential to determine whether the plaintiff's discharge was justified, at least in regard to ITT's claims involving the alleged use of improper accounting procedures. While ITT's counsel was willing to supply an affidavit from Lorraine commenting on the Arthur Andersen report, that offer was understandably rejected outright by plaintiff's counsel. In his affidavit, plaintiff's counsel asserted that he could not respond to ITT's motion for summary judgment until the documents were delivered and the depositions completed.

In his affidavit, plaintiff's counsel also recounted the difficulty he had had in attempting to schedule the deposition of Eugene Liesenfeld of ITT.[2] On one occasion shortly before the agreed-upon date of Liesenfeld's deposition, ITT sought an adjournment because Liesenfeld supposedly was in South America. Plaintiff's counsel later learned that, in fact, Liesenfeld had been attending a meeting in Detroit, Michigan, on the scheduled date.

After meeting with counsel on December 20, 1989, the court, by an order dated December 22, 1989, directed that the supervision of discovery remain with the Magistrate and that resolution of the motion for summary judgment would be deferred until discovery was completed. The court extended the deadline for completing discovery to April 18, 1990. *See* Item 18. The Magistrate thereafter continued to

---

**2.** Liesenfeld apparently was a member of ITT's senior management and higher in ITT's corporate hierarchy than Lorraine.

hold meetings with the parties in an attempt to settle the discovery dispute.

In late December, 1989, or early January, 1990, plaintiff's counsel presented to defense counsel a proposed order for the Magistrate's signature that was based on a hearing that had been held before the Magistrate on November 9, 1989. Defense counsel, however, refused to agree to the order as drafted, arguing that the proposed order was much broader than the plaintiff's original notice of motion. The plaintiff then brought a new motion to compel on January 17, 1990, and a hearing was held before the Magistrate on February 12, 1990. *See* Item 19. Approximately one week later, plaintiff's counsel forwarded a new proposed order to the Magistrate, who then allowed ITT to review and to comment upon the draft. When ITT finally indicated on March 15, 1990, that it had no objection, the Magistrate signed the order, *see* Item 21, a copy of which is attached as an Appendix. In addition to directing the production of documents, the order instructed that Liesenfeld's deposition be held within forty-four days from the date of the order. Although it did not appeal the Magistrate's order or bring new information to his attention that might have justified a modification of the order, ITT failed to comply.

On April 25, 1990, on the date set for a meeting with the court, ITT's counsel failed to appear. When plaintiff's counsel advised the court that ITT had not complied with the Magistrate's discovery orders, the court reminded counsel that there was no motion before the court and suggested that he return to the Magistrate and bring whatever motion would be appropriate to enforce the orders. The court then ordered, on April 27, 1990, that the time to complete discovery would be extended to August 15, 1990. *See* Item 22.

On May 2, 1990, plaintiff's counsel filed a motion returnable before the Magistrate to strike ITT's answer and for other sanctions. In two supporting affidavits, plaintiff's counsel again detailed his efforts to obtain ITT's compliance with the Magistrate's discovery orders. *See* Items 23 and 24. When the parties subsequently appeared before him, the Magistrate referred the matter back to the court in light of the nature of the relief sought by the plaintiff.

In a brief affidavit dated May 10, 1990, defense counsel responded to the motion. In the affidavit, defense counsel represented: "I have received most of the documentation that was requested by plaintiff's counsel. Such information is being forwarded to plaintiff's counsel by separate letter." Item 25 at ¶ 5. He further stated: "With regard to any remaining information which is outstanding, I have asked defendant to diligently prepare and forward such information." *Id.* at ¶ 6. Defense counsel, however, failed to offer any explanation for the delay in complying with the Magistrate's orders. In addition, no affidavit was offered by any representative of ITT detailing what, if any, efforts had been made in an attempt to comply.

When the parties appeared before the court on June 18, 1990, ITT's attorney was granted additional time to file an explanatory affidavit. During that meeting, defense counsel attempted to reargue the motion to compel that had been decided by the Magistrate in his March 15, 1990, order. He also claimed that all documents had been produced despite his prior representation that more documents would be made available to the plaintiff. The court warned defense counsel that it would not consider an attorney's affidavit based on information and belief to explain the failure to comply, and that his arguments should have been made previously to the Magistrate. By that time, ITT had had more than adequate time either to produce the documents or to make a record before the Magistrate sufficiently detailing its alleged inability to do so.

On June 26, 1990, despite the court's explicit direction to the contrary, defense counsel once again supplied only his own affidavit. In the affidavit, he related his version of the difficulties that the parties had had in scheduling depositions, and asserted that ITT had produced all the required records. Incredibly, his conclusion was based on the representations of another attorney: "I have been advised by in

house counsel of ITT that all such documents in the audit files of ITT Corporation have been produced." Item 26 at ¶ 12. Moreover, no explanation was offered as to why it had taken so long to turn over the documents that had been produced, or as to what efforts had been made to find the documents that ITT claimed either did not exist or could not be found. The affidavit was thus an entirely insufficient response to the court's direction.

A responding affidavit was filed by plaintiff's counsel on June 28, 1990, in which he recounted the difficulties he had experienced in obtaining compliance with prior orders of the court and of the Magistrate, and refuted a suggestion made by defense counsel that discovery had been proceeding relatively smoothly. He also detailed the documents that had yet to be produced by ITT. *See* Item 27.

The plaintiff also submitted an affidavit in which he explained that, because of the nature of his employment with ITT over the course of 19 years, he was fully familiar with ITT's policies, procedures, and practices concerning accounting and auditing functions, and the type of related correspondence and memoranda routinely produced by ITT. He also explained that this familiarity included ITT's relations with Arthur Andersen & Company. The plaintiff stated that, based on his personal knowledge, the documents that had not been produced by ITT did, in fact, exist. He also noted that proof of his assertion was provided in part by what ITT *did* produce; specifically, ITT had produced two pages of a 1986 year-end audit memorandum that, in accordance with the Magistrate's order of March 15, 1990, should have been produced in its entirety. The plaintiff asserted that ITT would have similar memoranda for other years and for other ITT entities. Significantly, the plaintiff identified the individual he claimed would have many of the documents in question: he stated that the documents would be under the control and filed in the office of William Brown, the Chief Internal Auditor for ITT. He also asserted that these documents would be

needed to test Liesenfeld's credibility. In addition, he noted—again based on his personal experience with ITT—the virtual impossibility that a significant amount of correspondence and internal memoranda would not have been generated in connection with some of the events at issue, such as a $1.26 million purchase and a $2.8 million plant shutdown. He also refuted other claims by defense counsel regarding the alleged nonexistence of documents.

On June 29, 1990, the court heard oral argument on the plaintiff's motion for sanctions, and found that sanctions should be imposed against ITT at least in the form of attorney's fees and related expenses. *See* Item 46 at 15–16. *See also* Item 28 at 1. During the hearing, the plaintiff advised that, in addition to William Brown, two persons with knowledge of the documents at issue were Cabell Woodward, the Chief Financial Officer of ITT, and the partner at Arthur Andersen in charge of ITT's audits.[3] The court stated that if ITT did not supply affidavits from these individuals, it would have to submit an affidavit explaining why it believed they were unnecessary. The court further noted that financial officers with control over documents of the types at issue rather than in-house attorneys were the appropriate individuals to make the document searches. *See* Item 46 at 21–22. With regard to the missing documents, defense counsel stated: "[T]hose documents—I have sent to my client and they have drafted affidavits. I do not have them back yet." Item 46 at 12.

The court withheld decision on the plaintiff's motion to strike in light of the severe nature of that sanction, and allowed ITT additional time to supply affidavits from knowledgeable individuals explaining in detail whether the documents in dispute existed. In the order subsequently issued on July 3, 1990, the court gave ITT until July 20, 1990, to supply the affidavits, and made clear that affidavits from counsel would be insufficient to withstand the plaintiff's motion. *See* Item 28.

Two affidavits were subsequently filed on July 20, 1990, both of which were three

---

3. The plaintiff did not know the name of the    latter individual.

brief paragraphs long. One was from Lorraine, who apparently was no longer an employee of ITT at the time he executed the affidavit. *See* Item 32 at ¶ 4. He stated that, during the time he was ITT's Chief Financial Officer, he had reviewed the audit files in the Controller's Department of ITT to determine whether there were any year-end memoranda from Arthur Andersen & Company relating either to the capital accrual at the Aimco Division in 1986 or to the accrual for the shutdown or relocation of Aimco's Tonawanda, New York, facility in 1986, 1987, or 1988. He stated that "[t]o the extent any such documents exist, I have previously supplied copies to [defense counsel]." Item 30 at ¶ 2. He also stated that he had "requested production" of other documentation relating to Aimco from "Teves, [ITT], and ITT Corporation,"[4] and claimed once again that "[t]o the extent that any such documents exist, they have been previously supplied [to defense counsel]." *Id.* at ¶ 3. It is apparent from his affidavit that Lorraine was not in a position to conduct a search as directed by the court and by the Magistrate, and that he was simply relating his recollection of a review he had made at some earlier, unstated time. He did not explain how any document searches had been conducted or from whom he had "requested production." He also failed either to identify the documents that had been turned over to defense counsel or to specify when they had been supplied. In addition, no explanation was tendered as to why an affidavit was being offered by Lorraine instead of by a person who had direct control of documents of the types in question.

The second affidavit was supplied by Bernard F. Stewart, who was Vice President, Secretary, and General Counsel of ITT, as well as an officer of ITT Corporation. He stated that he had "*caused a search to be made* of the records of ITT Corporation, [ITT], Alfred Teves and such other entities of ITT Corporation which, *in my opinion*, might have files of the type referenced in the affidavit of Robert Burke." Item 31 at ¶ 3 (emphasis added). He further stated that he knew "of no documents not already produced to [defense counsel] which are in any way responsive to the requests made by Mr. Burke." *Id.* Once again, no explanation was offered as to who had made the search, how the search had been made, or why the Arthur Andersen documents were no longer available.

Contrary to the explicit direction of the court, ITT thus failed to supply affidavits from any of the individuals whom the plaintiff had identified or from someone explaining why ITT believed declarations from those individuals were unnecessary. Furthermore, ITT once again supplied—in direct contravention of the court's instructions—an affidavit from in-house counsel. Moreover, as plaintiff's counsel observed, neither Lorraine nor Stewart had ever had custody of the types of records at issue. *See* Item 32.

An additional affidavit supplied by the plaintiff on July 24, 1990, provides further cause for finding the presentation made by the defense inadequate. According to the plaintiff, Lorraine left ITT before the Magistrate's order was issued and, therefore, was not in a position to make a search pursuant to the order. Furthermore, he was never associated with the office where the year-end memoranda are kept, as he worked instead out of ITT's Detroit office. The plaintiff also noted that the name of the Arthur Andersen auditor who allegedly discussed his deficiencies with Liesenfeld was not supplied, and that, in fact, no information had ever been supplied by an Arthur Andersen representative despite the fact that the firm continued to serve as ITT's auditor. *See* Item 33.

Finally, on July 26, 1990, an additional affidavit was supplied by ITT from John Horvath, a partner in Arthur Andersen's Rochester, New York, office. He stated that, at the request of ITT, his office had reviewed its files to determine whether there were any year-end memoranda relat-

---

4. "Alfred Teves" apparently is a corporate subsidiary of ITT, and "ITT Teves, N.A." appears to be a division of Alfred Teves. Lorraine did not specify the "Teves" to which he was referring.

ing to either the capital accrual involving Aimco in 1986 or the accrual for the shutdown or relocation of the Aimco facility in Tonawanda. He stated that "we" found various documents relating to a limited review that had been conducted by his office for the years 1986 and 1987, including two inter-office memoranda dated February 11, 1987, and a memorandum dated January 13, 1987. Item 34 at ¶¶ 1–3. Horvath did not mention any review relating to any ITT entity other than Aimco. He also failed to identify who had made the request for the review that was undertaken or the specific files his office had been asked to review. In addition, he did not give any reason to believe that Arthur Andersen had not conducted a complete review of ITT Corporation for the years 1986 through 1989. Following a familiar pattern, the Horvath affidavit was served on plaintiff's counsel seven days after the deadline set by the court for the filing of ITT's affidavits.[5]

According to a reply affidavit submitted by the plaintiff on July 30, 1990, Arthur Andersen's Rochester office is but a small regional office, and it would have been extraordinary for that office to have conducted any audit for ITT, Teves, or ITT Automotive. He also noted that his attorney had attempted to contact Horvath directly in order to clarify his affidavit, but that Horvath had not returned his attorney's telephone calls. *See* Item 35.

The court subsequently directed the parties each to file a chronological history of the pretrial proceedings. A hearing was then held on October 18, 1990, during which the court once again solicited views from both sides as to what steps should be taken to resolve this dispute. In an order dated November 21, 1990, the court directed that additional briefs be filed on the disputed issues. *See* Item 43.

## DISCUSSION

■ Rule 37 of the Federal Rules of Civil Procedure authorizes a broad range of sanctions for failure to comply with dis-

covery requirements. The rule provides in pertinent part that if a party "fails to obey an order to provide or permit discovery," the court may sanction that party by entering

> [a]n order striking out pleadings or parts thereof ... or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

FED.R.CIV.PROC. 37(b)(2)(C). These measures are "extreme sanctions, to be deployed only in rare situations." *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1064 (2d Cir.1979). *See also John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 845 F.2d 1172, 1176 (2d Cir.1988); *Jones v. Niagara Frontier Transportation Auth.*, 836 F.2d 731, 734 (2d Cir.1987), *cert. denied*, 488 U.S. 825, 109 S.Ct. 74, 102 L.Ed.2d 50 (1988); *Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir.1986).

■ A court's authority to impose Rule 37 sanctions is limited by constitutional considerations of due process. In *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958), the United States Supreme Court, in reviewing a district court's dismissal of a complaint because of the plaintiff's failure to comply fully with a pretrial document-production order, stated the following:

> The provisions of Rule 37 which are here involved must be read in light of the provisions of the Fifth Amendment that no person shall be deprived of property without due process of law, and more particularly against the opinions of this Court in *Hovey v. Elliott*, 167 U.S. 409 [17 S.Ct. 841, 42 L.Ed. 215 (1897)], and *Hammond Packing Co. v. Arkansas*, 212 U.S. 322 [29 S.Ct. 370, 53 L.Ed. 530 (1909)]. These decisions establish that there are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action

**5.** The court notes that such late filings as well as late appearances have been additional irritants throughout the course of this case.

without affording a party the opportunity for a hearing on the merits of his cause.

357 U.S. at 209, 78 S.Ct. at 1094. In *Hovey v. Elliott,* the Supreme Court had held that striking an answer as punishment for refusing to obey a court order without affording a defendant any hearing whatsoever constituted a denial of due process of law. In *Hammond Packing Co. v. Arkansas,* the Court had upheld as consistent with due process the striking of an answer and the rendering of a default judgment against a defendant who had refused to comply with a pretrial document-production order. The Court distinguished *Hovey* as involving the denial of a party's right to defend as a "mere punishment" for contempt, and concluded that in *Hammond* due process had been preserved because the state was simply employing a permissible presumption that the refusal to produce material evidence was an admission that the defense had no merit. 212 U.S. at 350–51, 29 S.Ct. at 379–80. The Court emphasized, however, that the defendant in *Hammond* was required only to make "a *bona fide* effort to comply" with the pretrial order, and that, therefore, "any reasonable showing of an inability to comply would have satisfied the requirements" of the order. 212 U.S. at 347, 29 S.Ct. at 378 (emphasis supplied).

Courts have generally required that, in order to justify imposition of the most severe sanctions, there must be some element of culpability present. Thus the Supreme Court held in *Societe Internationale v. Rogers* that Rule 37

> should not be construed to authorize dismissal of [a] complaint because of petitioner's noncompliance with a pretrial production order when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of petitioner.

357 U.S. at 212, 78 S.Ct. at 1096. The Court concluded that the dismissal of the plaintiff's complaint in that case violated due process because the plaintiff's failure to comply with the production order at issue was due neither to its own conduct nor to circumstances within its control.

357 U.S. at 211–12, 78 S.Ct. at 1095–96. *See also National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 640, 96 S.Ct. 2778, 2779, 49 L.Ed.2d 747 (1976) (per curiam); *Salahuddin v. Harris,* 782 F.2d at 1132; *Flaks v. Koegel,* 504 F.2d 702, 707–09 (2d Cir.1974). The United States Court of Appeals for the Second Circuit has held that the "fault" criterion enumerated in *Societe Internationale v. Rogers* includes grossly negligent failure to obey an order compelling discovery. *See Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d at 1066–68.

Rule 37 sanctions are intended to serve essentially three purposes:

> First, they ensure that a party will not benefit from its own failure to comply. Second, they are specific deterrents and seek to obtain compliance with the particular order issued. Third, they are intended to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault.

*Update Art, Inc. v. Modiin Pub., Ltd.,* 843 F.2d 67, 71 (2d Cir.1988) (citing *National Hockey League v. Metropolitan Hockey Club, Inc., supra; Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d at 1066). In particular, courts have stressed the importance of the deterrent effect of sanctions. As the Supreme Court stated in *National Hockey League v. Metropolitan Hockey Club, Inc.:*

> [H]ere, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.

427 U.S. at 643, 96 S.Ct. at 2781.

The Second Circuit has repeatedly emphasized the importance of compliance with discovery orders. For example, in *Update Art, Inc. v. Modiin Pub., Ltd.,* the Second Circuit described compliance as "necessary

to the integrity of our judicial process," and warned that "[a] party who flouts such orders does so at his peril." 843 F.2d at 73. *See also Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d at 1068; *Sieck v. Russo*, 869 F.2d 131, 134 (2d Cir.1989).

▮ In determining whether to impose sanctions under Rule 37, a trial court should consider a number of factors. Those frequently cited by the Supreme Court and the Second Circuit include: 1) the history of the failure to comply with court orders; 2) whether the party violating the order was given ample time to respond; 3) the effectiveness of alternative sanctions; 4) whether the noncomplying party was warned of and given an opportunity to argue against the impending sanction; 5) the prejudice to the adversary caused by the failure to comply; 6) whether the documents at issue would normally be readily obtainable; and 7) the extent of the party's personal responsibility.

### 1. History of the Failure to Comply

In *United States Freight Co. v. Penn Central Transportation Co.*, 716 F.2d 954 (2d Cir.1983) (per curiam), the Second Circuit stated that:

> Standing alone, a single pretrial violation, such as [a] party's failure to respond to a document request by the date ordered, would not ordinarily result in an imposition of a sanction of such finality as striking [a defendant's] answer and entering judgment by default.

*Id.* (citation omitted). The court, however, upheld those sanctions under Rule 37 based on the persistent dilatory conduct of the defendants in that case. *Id.* at 955. The recent case of *United States v. Aldeco*, 917 F.2d 689 (2d Cir.1990), does not hold otherwise. In that case, a district court was found to have abused its discretion by entering a default judgment as a sanction for the failure to answer interrogatories in a timely manner. The Second Circuit emphasized, however, that the case did not involve a pattern of repeated discovery violations, and distinguished *Penn Central* on that ground. *Id.* at 690.

The record in the present case reveals a course of conduct through which ITT has persistently violated orders of the court and of the Magistrate: promises and commitments were constantly made but not kept by ITT; affidavits were filed by defense and in-house counsel in blatant disregard of the court's direction that affidavits had to be filed by individuals with personal knowledge of the matters in dispute; ITT was given repeated opportunities either to supply the requested documents or to explain why they allegedly were not available; and, time and again, appropriate filings either were not made or were made after the deadlines set by the court and by the Magistrate. Of particular significance has been ITT's ongoing violation of the Magistrate's discovery order of March 15, 1990. Despite the court's patience in repeatedly allowing ITT extra time to comply with the Magistrate's order, and despite the court's clear warnings that severe sanctions were being considered, ITT has yet to comply with that order or to explain its alleged inability to do so.

### 2. Time Allowed to Respond to Discovery Orders

In *National Hockey League v. Metropolitan Hockey Club, Inc.*, the Supreme Court upheld the dismissal of an action due to failure to comply with discovery orders, noting that the "district court was extremely patient in its efforts to allow the respondents ample time to comply." 427 U.S. at 642, 96 S.Ct. at 2780. The court also noted that the responses ultimately filed were grossly inadequate. *Id. See also Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d at 72. In the present case, the plaintiff's first attempt to compel discovery of some of the documents at issue was made in January, 1988. Although on at least two occasions ITT has indicated that the documents at issue would be produced in accordance with the Magistrate's order, ITT has yet to comply or to offer any justification for its failure to do so. It is clear that ITT has had ample time to do either.

### 3. Effectiveness of Alternative Sanctions

In *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, the Second Circuit noted that trial courts usually should consider alternative, less-drastic responses before imposing a sanction as severe as that of dismissal. 845 F.2d at 1176. *Cf. Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir.1988) (before employing the extreme sanction of precluding testimony, trial court must consider less-drastic responses). In *Sieck v. Russo*, however, the Second Circuit stated that "[t]he mere availability of softer sanctions, however, does not bar a court from imposing the default sanction." 869 F.2d at 134.

This court held on June 29, 1990, that the plaintiff was entitled to at least attorney's fees as a result of ITT's conduct, and that striking ITT's answer would also be considered as an additional sanction. At that time, the court also directed ITT to supply affidavits from the individuals whom the plaintiff had identified as having personal knowledge of the documents at issue; the court further directed that if ITT did not supply affidavits from these individuals, it would have to submit an affidavit explaining why it believed they were unnecessary. In an order issued a few days later, the court also made clear that affidavits from counsel would be insufficient to withstand the plaintiff's motion to strike.

Despite the award of attorney's fees and the accompanying warning, ITT proceeded to defy the court's instructions once again, not only failing to submit affidavits from either the individuals identified by the plaintiff or someone who could explain why they were unnecessary, but also submitting an affidavit from precisely the type of affiant from whom the court did not want to hear: an in-house attorney.

In light of such insolence by ITT, it seems highly unlikely that anything but the harshest of medicines has any chance of curing ITT of its penchant for flouting court orders. In particular, it appears that an additional monetary sanction has little, if any, chance of deterring a corporate defendant with the resources of ITT from employing such inexcusable dilatory tactics in the future.

### 4. Warning of and Opportunity to Argue Against the Impending Sanction

In upholding preclusive sanctions under Rule 37(b) in *Update Art, Inc. v. Modiin Pub., Ltd.*, the Second Circuit noted that the parties against whom sanctions had been imposed had not been unfairly surprised, having been repeatedly warned that continued violation of discovery orders would lead to sanctions that could include the preclusion of evidence. 843 F.2d at 72. In *United States Freight Co. v. Penn Central Transportation Co.*, the Second Circuit sustained the striking of a defendant's answer and the entering of a default judgment, stating:

> Where, as here, that expressly permitted sanction was imposed for failure to comply with a discovery order of which the party had proper notice, and only after an opportunity to argue its case against the proposed sanction, the court has both protected Penn Central's procedural rights and acted within the proper scope of its discretion.

716 F.2d at 955. Similarly, in *Paine, Webber, Jackson & Curtis, Inc. v. Inmobiliaria Melia de Puerto Rico, Inc.*, 543 F.2d 3, 5 (2d Cir.1976), *cert. denied*, 430 U.S. 907, 97 S.Ct. 1178, 51 L.Ed.2d 583 (1977), Rule 37 sanctions were upheld where the defendant had been warned that continued failure to comply with a discovery order would result in the answer being stricken and in the entry of a default judgment for the plaintiff. 543 F.2d at 5. *See also John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 845 F.2d at 1177 (dismissal of complaint justified in light of flagrant disregard of three court orders, which included two warnings of possible dismissal).

In the present case, ITT has been on notice that its answer might be stricken since May 2, 1990, when the plaintiff first moved for that sanction. In addition, ITT should have been fully aware of how seriously the court considered the matter by June 18, 1990, when the court, noting the inadequacy of defense counsel's May 10,

1990, affidavit, demanded from ITT an explanatory affidavit responding to the plaintiff's motion. Furthermore, in the course of awarding attorney's fees to the plaintiff during the June 29, 1990, hearing, the court made abundantly clear to ITT that it was considering striking the answer as an additional sanction.

Despite this additional opportunity to argue its case, and in the face of explicit warnings that affidavits from knowledgeable individuals were necessary and that affidavits from counsel would not be sufficient to withstand the plaintiff's motion, ITT proceeded to file affidavits from: its lead defense counsel (which itself was based on information provided by ITT's in-house counsel); an ex-employee who never had had direct custody of the documents at issue; an in-house attorney; and a representative of its auditor who clearly lacked direct custody or personal knowledge of the documents in question.

Following these unresponsive filings, the court gave ITT additional opportunities to be heard on October 13 and 18, 1990. Finally, in an order dated November 21, 1990, the court allowed ITT to file a brief in its defense.

Under these circumstances, no further hearing is required or justified.

### 5. Prejudice to the Plaintiff Caused by the Failure to Comply

In *Outley v. City of New York*, the Second Circuit held that, before the extreme sanction of preclusion of evidence may be used by a district court, "a judge should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses." 837 F.2d at 591. Similarly, in *Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863 (3rd Cir.1984), the Third Circuit, in deciding whether a trial court had abused its discretion in dismissing a complaint, considered "the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery." *Id.* at 868 (emphasis omitted).

In the case at bar, the plaintiff asserts that the documents he seeks are essential to an effective response to ITT's motion for summary judgment. The record fully supports this contention. Furthermore, it is difficult on this record to conclude other than that at least some of the disputed documents do, in fact, exist, if for no other reason than ITT has never provided anything even resembling an adequate explanation for its failure to produce them. It is thus apparent that ITT's actions have significantly, if not decisively, prejudiced the plaintiff.

### 6. Availability of the Documents at Issue

In *Update Art, Inc. v. Modiin Pub., Ltd.*, the Second Circuit noted that the appellants in that case had inexcusably failed to provide information necessary to the action. The court held that the availability of the severe sanction of preclusion was particularly important when " 'the very material sought to be discovered ... will normally be in the possession of a defendant and will frequently be unknown to a plaintiff.' " 843 F.2d at 72 (quoting *Compagnie des Bauxites de Guinea v. Insurance Co. of N. Am.*, 651 F.2d 877, 885 (3rd Cir.1981), *aff'd*, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)). Similarly, in *Paine, Webber, Jackson & Curtis, Inc. v. Inmobiliaria Melia de Puerto Rico, Inc.*, the Second Circuit upheld an order striking a defendant's answer and entering a default judgment where the defendant had failed to account for the nonproduction of corporate records that appeared "to be pertinent to the litigation and would normally be expected to be readily obtainable." 543 F.2d at 6.

In the instant case, the plaintiff has stated under oath that, based on his 19 years of employment experience with ITT, the documents at issue do, in fact, exist and are readily obtainable. Indeed, the plaintiff even advised the court and defense counsel as to precisely where many, if not all, of the documents could be found and who would have direct custody of or control over them. To date, ITT has failed to submit any affidavits either contradicting the plaintiff's assertions or justifying its

**36**

failure to produce the documents. As noted above, it thus is difficult to conclude other than that at least some of the disputed documents do exist.

### 7. Extent of the Party's Personal Responsibility

█ In deciding whether to impose sanctions, a court can consider both the personal responsibility of a party as well as the responsibility of counsel, *see, e.g., National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. at 643, 96 S.Ct. at 2781, although "[t]he acts and omissions of counsel are normally wholly attributable to the client." *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d at 1068 n. 10 (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)).

In the present case, the record compels the conclusion that, while it is not entirely clear whether fault lies chiefly with defense counsel or with his client, the persistent disregard of orders from both the court and the Magistrate has been willful, if not calculated. The repeated instructions from the court and the Magistrate were clear and unambiguous. Nevertheless, defense counsel consistently failed to supply information as directed. Moreover, the court must assume that defense counsel relayed at least the contents of the court's and the Magistrate's orders to his client, and that the client understood its responsibility to comply. This conclusion is particularly justified in the present case since the client is a large, sophisticated corporation whose general counsel himself supplied a response to one of the court's orders. Furthermore, that the affidavit supplied by general counsel—who was also Vice President and Secretary of ITT, as well as an officer of ITT Corporation—was such an inadequate reply to the court's order merely lends further support to the conclusion that the client was engaged in deliberate stonewalling.

### CONCLUSION

The facts belie ITT's contention that it has "diligently searched and provided the items sought in the discovery order," Item 45 at 5, and that "there is an inability to produce any additional documents." *Id.* Credible assertions by the plaintiff as to the availability of the documents at issue, past representations by ITT that documents would be forthcoming, and the inability of ITT to provide an adequate excuse for nonproduction all indicate that the failure to comply with the orders of the court and of the Magistrate has been willful, if not calculated. This disregard by ITT of its responsibilities as a litigant can only be characterized as demonstrating flagrant bad faith. Moreover, the insolence displayed by ITT with respect to other discovery, such as cancelling Liesenfeld's deposition on short notice by falsely claiming he was out of the country, lends further support for these conclusions.

This case has been characterized by a history of inexcusable dilatory conduct by ITT. ITT has been given more than ample time to respond to discovery orders, and the court has given clear warnings that more severe sanctions than the payment of attorney's fees could result. ITT could have easily complied with the plaintiff's discovery requests or explained its inability to do so; in the nearly four years since the plaintiff made his original discovery request, ITT has done neither. Moreover, ITT's conduct has critically hampered the ability of the plaintiff to support his case. In addition, the court notes that ITT's conduct has managed to frustrate one of the purposes of the overall scheme of federal discovery rules by embroiling the court in continual supervision of discovery. *See Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d at 1068 (citing *Dellums v. Powell*, 566 F.2d 231, 235–36 (D.C.Cir.1977)). In light of the entire record, it appears that ordering less than the striking of ITT's answer would, in effect, reward ITT's contemptuous conduct.

It may well be, as ITT argues, that there were legitimate reasons for discharging the plaintiff, and that, in any event, the documents at issue do not relate to ITT's claim that the plaintiff was guilty of a conflict of

interest. Under circumstances such as those presented here, however, the court believes it is entirely appropriate to preclude a defendant from presenting even a potentially meritorious defense. In short, as a response to conduct as insolent as that displayed by ITT in this case, nothing less than striking the answer will suffice. *See generally In the Matter of Visioneering Constr. and Dev. Co.*, 661 F.2d 119 (9th Cir.1981); *Commw. of Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652 (1st Cir. 1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981); *Emerick v. Fenick Industries, Inc.*, 539 F.2d 1379 (5th Cir.1976); *Marshall v. F.W. Woolworth, Inc.*, 122 F.R.D. 117 (D.P.R.1988).

Consequently, the plaintiff's motion to strike ITT's answer is granted. The plaintiff is also granted leave to file a motion for default judgment under Rule 55(b)(2) of the Federal Rules of Civil Procedure, and the court hereby waives the requirement of Local Rule 27(b) that the motion include a Clerk's certificate of the entry of default. The court will then set a meeting date to determine whether a default hearing is necessary and, if so, how it shall proceed. Finally, the defendant shall pay the plaintiff within thirty days $9,375 to cover attorney's fees relating to this discovery dispute that were incurred as of July 9, 1990. *See* Item 29. Plaintiff's counsel may submit a supplemental affidavit detailing any disbursements or additional fees associated with this dispute to which he believes he is entitled.

So ordered.

## APPENDIX

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF NEW YORK

Robert Burke, Plaintiff

-vs-

ITT Automotive, Inc., Defendant

CIV-87-1182C

## ORDER

The plaintiff by his attorney, FRANK P. McGARRY, ESQ., having moved this Court before Magistrate Maxwell by Notice of Motion dated November 1, 1989 with the annexed affidavit of Frank P. McGarry, Esq. dated November 1, 1989 and said motion having been heard before Magistrate Maxwell on November 9, 1989; and the plaintiff again having moved this Court by Notice of Motion dated January 17, 1990 with the annexed affidavit of Frank P. McGarry, Esq., sworn to the 17th day of January, 1990 and said motion having been heard before Magistrate Maxwell on February 12, 1990, for an Order requiring the defendant to turn over to the plaintiff the following documents: (1) Arthur Andersen year-end audit memorandum as they pertain to the ITT Aimco Division, ITT Teves North America, ITT Automotive, and the ITT Corporation for the years ending December 31, 1986; 1987; and 1988; (2) Any correspondence between Arthur Andersen and ITT Aimco Division, ITT Teves North America, ITT Automotive and the ITT Corporation as it pertains to the accrual of capital assets and the accrual of plant shutdown for the Tonawanda facility for the time period December 31, 1986 through December 31, 1989; and (3) Any internal correspondence between ITT Aimco Division, ITT Teves North America, ITT Automotive and ITT Corporation as it pertains to the accrual of capital assets and the accrual of the plant shutdown of the Tonawanda facility for the period December 31, 1985 through December 30, 1989; and (4) production of pension computations for the plaintiff including the differences in the amount received based on retirement at 55 versus the age at which he was terminated for all of the following assumptions: (a) retirement at age 55; (b) retirement at age 62; and (c) retirement at age 65; and for an Order requiring that Mr. Lisenfeld be produced for a deposition at the offices of Quinn & McGarry, P.C., 1600 Statler Towers, Buffalo, New York, within two (2) weeks following receipt of all of the aforesaid documents and for an Order requiring the defendant to disclose the name, address and telephone number of the Arthur Andersen auditor who allegedly complained to ITT about the accrual of capital on the

**38**

books by Robert Burke and/or made any other complaint concerning the performance of Robert Burke as a comptroller for the defendant and Frank P. McGarry, Esq., having appeared in support of said motion and Michael R. Moravec, Esq., having appeared on behalf of the defendant in opposition to said motion and the plaintiff having stipulated that the discovery materials not be used for any purpose other than which is directly related to the presentation of this case and due deliberation having been had thereon, it is hereby

ORDERED, that the plaintiff's motion is in all respects granted and the defendant is hereby required to produce within thirty (30) days of the date of this Order all of the following materials: (1) Arthur Andersen year-end audit memorandum as they pertain to the ITT Aimco Division, ITT Teves North America, ITT Automotive, and the ITT Corporation for the years ending December 31, 1986; 1987; and 1988; (2) Any correspondence between Arthur Andersen and ITT Aimco Division, ITT Teves North America, ITT Automotive and the ITT Corporation as it pertains to the accrual of capital assets and the accrual of plant shutdown for the Tonawanda facility for the time period December 31, 1986 through December 31, 1989; and (3) Any internal correspondence between ITT Aimco Division, ITT Teves North America, ITT Automotive and ITT Corporation as it pertains to the accrual of capital assets and the accrual of the plant shutdown of the Tonawanda facility for the period December 31, 1985 through December 30, 1989; and (4) production of pension computations for the plaintiff including the differences in the amount received based on retirement at 55 versus the age at which he was terminated for all of the following assumptions: (a) retirement at age 55; (b) retirement at age 62; and (c) retirement at age 65; and it is further

ORDERED, that the plaintiff shall not use the materials for any purpose other than that directly related to the litigation of this case and it further

ORDERED that the defendant produce the name, address and telephone number of the Arthur Andersen auditor who allegedly discussed the accounting deficiencies of Mr. Burke with Mr. Lisenfeld as they pertain to the accrual of capital which was one of the alleged basis for Mr. Burke's firing; and it further

ORDERED, that the defendant produce for a deposition Mr. Lisenfeld at the plaintiff's offices within forty-four (44) days from the date of this Order.

So Ordered.

3/15/90

/s/ Edmund F. Maxwell